UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROY FLUKER, III, | ) | |
| | ) | |
| Petitioner, | ) | 13 C 7643 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### Memorandum Opinion and Order

Roy Fluker, III was tried with his father Roy Fluker, Jr. and his sister Ronnanita Fluker

for defrauding thousands of investors through various Ponzi-like schemes. *United States v.*

*Fluker*, 08 CR 540 (N.D. Ill.). After a three-week trial before District Judge Coar, the jury

convicted Roy III of five counts of wire fraud under 18 U.S.C. § 1343. *Id.*, Doc. 166. After the

case was reassigned to the undersigned judge, Roy III was sentenced to a below-Guidelines term

of 96 months in prison, three years of supervised release, and $7,336,957.49 in restitution. *Id.*,

Doc. 304. The Seventh Circuit affirmed. *United States v. Fluker*, 698 F.3d 988 (7th Cir. 2012).

Roy III then moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255.

Docs. 1, 46. Procedural skirmishes ensued, including an unsuccessful appeal by Roy III to the

Seventh Circuit, which resulted in a temporary stay of the proceedings in this court. Docs. 12,

22, 40. Having carefully reviewed the § 2255 briefs and the relevant portions of the record in the

underlying criminal case, the court denies Roy III's motion.

### Background

In May 2005, Roy Jr. founded All Things in Common, LLC, which did business as More

Than Enough, Inc. ("MTE"). *Fluker*, 698 F.3d at 992. Months later, he founded a second

1

company, Locust International, LLC. *Ibid.* Through these businesses, Roy Jr., Ronnanita, and Roy III operated two investment programs: the Spend and Redeem program, and the Housing program. *Ibid.* Under the Spend and Redeem program, participants would invest a certain amount of money, ranging from $500 to $5,000, and were guaranteed that their investments would triple after one year. *Id.* at 993. Under the Housing program, participants would refinance or sell their homes and pay their equity proceeds to MTE, which in turn would invest that money and use the investment returns to reduce the participants' monthly mortgage payments and pay off their mortgages in five years. *Ibid.*

Although promoted separately, the two programs operated as a single enterprise. The Spend and Redeem program was intended to lure investors into participating in the Housing program, and funds from both programs were commingled in the same bank accounts. *Id.* at 993-95. Roy Jr. told participants that he could not reveal his investment strategies because they were patented. *Id.* at 994. In fact, the programs were destined to collapse, as the money MTE received was not invested, but rather "was used for a multitude of expenses, including but not limited to the MTE Board Members' salaries and cars, tropical vacations, and purchasing real estate. Hundreds of thousands of dollars were used for [Roy Jr., Ronnanita, and Roy III's] personal expenses and affairs, like payments for Roy III's wedding." *Id.* at 994-95. The entire scheme eventually collapsed, as the money redeemed by current participants exceeded the money invested by new participants. *Id.* at 995.

## Discussion

Roy III challenges his conviction and sentence on several grounds.

## I.    Ineffective Assistance of Counsel

Roy III alleges that he received ineffective assistance in several respects from his trial attorney Jason Bruce and his sentencing attorney John Beal; Bruce was retained, while Beal was appointed. *Fluker*, 08 CR 540, Docs. 19, 195, 198-200. The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984)). A petitioner can establish that his attorney was ineffective by showing that (1) the attorney's performance was deficient and (2) that he was prejudiced as a result. *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (citing *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). As to the performance prong, Roy III "must show that his lawyer's work 'fell below an objective standard of reasonableness.'" *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 688). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Berg*, 714 F.3d at 499 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.") (internal quotation marks omitted). To satisfy the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to … address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697; *see also United States v. Taylor*, 569 F.3d 742, 748 (7th Cir. 2009) ("Courts may deny ineffective assistance of counsel claims for lack of prejudice without ever considering the question of counsel's actual performance.").

### A. Failure to Interview Potential Witnesses

Roy III first argues that Bruce, his retained trial counsel, was ineffective for failing to interview potential witnesses. Doc. 1 at 9. Those witnesses, according to Roy III, would have testified that he "did not know what was going on with the company investments" and that he was "fooled just like everyone else … in the scheme." *Id*. at 10. In support, Roy III submits affidavits from Flora Davis, Grace Edwards, and Mabel Wayne—all members of MTE's Board of Directors—detailing the extent of his involvement in MTE. *Id*. at 16-23. However, those affidavits provide no basis to believe that he had been "fooled just like everyone else."

Davis and Edwards aver that Roy III "never really had anything to do with the actual operation of … the Spend and Redeem program" and that he "didn't become associated with the program until it got so big that we needed additional presenters to make presentations at the various churches." *Id*. at 17, 22. But Edwards actually testified at trial; at one point, Bruce asked her if Roy III was involved in the early stages of MTE, to which Edwards responded, "No, he was not." *United States v. Fluker*, 08 CR 540, Doc. 244 at 50. So the portion of the Davis and Edwards affidavits making the same point would not have changed the result had their averments been presented as testimony at trial. And even if the jury believed that Roy III did not

actively participate in the scheme until it had matured, the jury still could and would have found that he had the requisite *mens rea* to commit wire fraud upon joining the scheme. The portion of the affidavits averring that Roy III's role in the Spend and Redeem program was limited would not have detracted from Roy III's extensive role in the Housing program. *Id*. at 17, 22. And given that the two programs functionally operated as a single Ponzi scheme—recall that the Spend and Redeem Program was the hook to get participants to join the Housing Program and that investments from both programs were kept in the same bank accounts—it would have been meaningless from a *mens rea* perspective to present evidence that Roy III was less involved in the Spend and Redeem Program.

Wayne avers that she remembers Roy III "giving very few presentations and those he did give were not very good or professionally done." *Id*. at 19. But the fact that Roy III was a poor presenter does not detract from his guilt. And in any event, Roy III's role went beyond making presentations; for instance, he would visit investors' homes to con them out of their home equity proceeds. *Fluker*, 08 CR 540, Doc. 247 at 230-31. That degree of personal involvement in the scheme belies any notion that his participation was limited.

Roy III also argues that Bruce's failure to call Wayne and Davis violated the Sixth Amendment's Compulsory Process Clause. Doc. 1 at 9. That Clause does not apply here, as "a defendant's right to compulsory process is abridged *only when a court denies* the defendant an opportunity to secure the appearance at trial of a witness 'whose testimony would have been relevant and material to the defense.'" *United States v. Williamson*, 202 F.3d 974, 979 (7th Cir. 2000) (emphasis added) (quoting *Washington v. Texas*, 388 U.S. 14, 23 (1967)). The failure to call those witnesses was Bruce's doing, not the court's.

**B.      Failure to Investigate and Present Mitigating and Exculpatory Evidence**

Roy III next argues that Bruce and Beal were inadequate in failing to investigate and present several pieces of mitigating and exculpatory evidence, and by failing to object to what Roy III deems unfairly inculpatory evidence.  Doc. 1 at 25.

First, Roy III points to two emails concerning possible investments—one for a company known as Global ForEx Trading, and another for ACE.  Doc. 1 at 37-39.  Roy III contends that these emails led him to believe that Roy Jr. was making legitimate business investments.  Doc. 53 at 4.  But the emails reveal nothing about MTE's investments—in fact, neither email even mentions MTE.  Doc. 1 at 37-39.  The first appears to be a generic set of instructions for how to deposit funds with Global ForEx, while the second is a single-page incomplete email from someone at ACE confirming receipt of two $140 checks to the "amgrace1 account" and the "Frank Davis trust account."  Those emails are not exculpatory, particularly given the strong evidence that Roy III made presentations to recruit new participants, made misrepresentations as to how the program's money would be invested, and was aware of the inherent implausibility of the scheme's promised returns.  As the Seventh Circuit noted in affirming his sentence, that evidence "amply support[s] a finding that Roy III knew both programs were fraudulent, yet continued to actively participate in their operation."  *Fluker*, 698 F.3d at 1005.  The two emails do not undermine that conclusion in any way.

The same holds for another document cited by Roy III, an unsigned merger agreement between Mony Mortgage and Locust International.  Doc. 1 at 98-107.  Roy III contends that this document proves that he "sought to have a joint venture with a [mortgage] broker" to ensure that "banking laws and procedures were being followed."  Doc. 53 at 8.  Again, this evidence is neither mitigating nor exculpatory.  Even assuming that a *signed* version of this contract exists, it

would not have led the jury to conclude that Roy III was not intentionally committing fraud. Given the overwhelming evidence against Roy III at trial, the jury almost certainly would have concluded that he attempted to team up with a mortgage broker to provide the sheen of legitimacy to his sham operation.

Roy III's next argument concerns his October 2007 stipulation with the Illinois Secretary of State's Securities Department, in which he admitted to being a presenter for the Spend and Redeem program. Doc. 47-1 at 2. That stipulation was read to the jury, and Roy III argues the Bruce should have objected to its introduction. Doc. 53 at 5. According to Roy III, he had difficulty reading due to a systemic inflammatory disease called sarcoid uveitis, so when his prior counsel (James Taylor) sent an email advising him to sign the October 2007 stipulation "and his legal problems would be over," Roy III complied even though his eye disease made "it hard for [him] to read the stipulation[]." Doc. 1 at 27. Roy III believes Bruce should have moved to exclude the stipulation in light of those circumstances.

But the email thread itself paints a different portrait. Taylor said only that the proposed agreements would "resolve the Dept. of Securities matter," not that Roy III's "legal problems would be over." Doc. 1 at 96. And contrary to Roy III's claim that he could not read the stipulation, the first sentence of his response to Taylor says that he "read the information" that Taylor provided. *Ibid*. In his reply brief, Roy III admits that he could read the stipulation but submits that his poor eyesight prevented him from understanding it. Doc. 53 at 5. Yet in his response, Roy III asked Taylor several questions about the implications of signing the stipulation. Doc. 1 at 96. So even assuming that his eyesight was impaired to some extent, Roy III's email confirms that he read the stipulation and understood it well enough to ask questions about it. Given the weakness of this evidence, it is highly unlikely that, had Bruce

raises questions regarding Roy III's eyesight, the jury would have acquitted Roy him. And it certainly is a reasonable strategic choice on Bruce's part not to present frivolous arguments to the jury that would have undermined his and Roy III's credibility.

Roy III also claims that Bruce was ineffective because he failed to timely disclose expert witness Richard O'Hern. *Id.* at 25. O'Hern is a real estate broker who planned to testify that the returns promised by the Housing program were feasible. *Id.* at 34 ("[W]e plan to call him to show that … in the Chicago area on the south and west sides in the five years leading up to this incident you could rehab property and that that would increase the value by 280 percent which … would make it reasonable to believe that you could take someone's 35 percent equity, invest it in real estate, and pay off a hundred percent of their mortgage in five years."). On May 20, 2010, Judge Coar sustained the Government's objection to O'Hern's testimony based on relevance and the lateness of his disclosure. *Id.* at 33-36. But later that day, Judge Coar reversed that ruling and allowed O'Hern to testify. *Fluker*, 08 CR 540, Doc. 251 at 13.

Several minutes into O'Hern's testimony, however, Judge Coar convened a side bar and expressed his concern that O'Hern was not qualified to evaluate "how much properties can be bought, rehabbed, and resold for." *Id.* at 65. Judge Coar further observed that O'Hern could not possibly extrapolate from the sale of a single property as to the housing market in a given Chicago neighborhood. *Id.* at 67-68. After sustaining the prosecution's objection to this line of questioning, Bruce declined to question O'Hern any further. *Id.* at 69. Given that O'Hern was ultimately allowed to testify, and that his testimony was cut short for reasons unrelated to Bruce's untimely disclosure, Roy III cannot show that the late disclosure prejudiced him.

The final piece of unused mitigating evidence cited by Roy III is a threatening voicemail left by prosecution witness Melvin Norwood. Doc. 1 at 27. Norwood testified that he refinanced

his home and gave Roy III $108,836 to invest through the Housing program, but that Locust and MTE failed to make payments toward his mortgage and never paid him back the equity in his home. *Fluker*, 08 CR 540, Doc. 247 at 224, 239. Roy III now says that Norwood left him a drunken voicemail threatening his life at some point after his indictment; he believes this voicemail should have been used to impeach Norwood because it "is clear evidence that the witness will be bias and fail to offer the truth" and that Norwood "should have never been given the opportunity to testify because … the voicemail proves that [he] was unstable." Doc. 1 at 27.

This argument is unpersuasive. First, Roy III offers no proof that this voicemail even exists. Second, assuming that Norwood left such a message, bringing it to the court's attention would not have resulted in precluding Norwood from testifying. Third, there are legitimate strategic reasons why Bruce could have decided not to introduce the voicemail. Playing the message to the jury may have underscored the extensive, real-world harm caused by Roy III's fraud. Hearing the sincerity of Norwood's voice might have made the jury more likely to believe his testimony. And the impeachment value of the voicemail is negligible. Norwood testified that Roy III scammed him out of thousands of dollars and put him at risk of losing his home. It would come as no surprise to anyone that Norwood disliked Roy III, and the jury could have concluded based on Norwood's story alone—without the voicemail—that he was biased against Roy III. Accordingly, Roy III cannot establish that Bruce's performance was deficient or that not introducing the voicemail cause him prejudice.

### C. Failure to Pursue and Secure a Plea

Roy III next argues that Bruce was ineffective by failing to seek and procure a plea deal. Doc. 1 at 115. Roy III alleges that he urged Bruce to negotiate a plea deal but that Bruce "was not familiar with the plea process in general so he claimed that he would refer to the other co-

defendant's attorney's [sic]." *Ibid.* When prompted for an update, Bruce "claimed that he was working on the plea but also preparing to go to trial" and later informed Roy III that "too much time had elapsed and the prosecutor wants to go to trial." *Id*. at 116. Roy III attaches an unsworn letter from his sister Ronnanita claiming that she "was offered a plea by [her] court-appointed attorney" in an effort to suggest that the prosecutor in this case was willing to negotiate. *Id*. at 120.

"The Sixth Amendment right to effective assistance of counsel extends to the plea bargaining process." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citing *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012)). The Supreme Court has held that an attorney's performance is constitutionally deficient if he fails to communicate a formal plea offer to his client. *See Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012). In so holding, however, the Court cautioned that "a defendant has no right to be offered a plea nor a federal right that the judge accept it." *Id*. at 1410 (citation omitted); *see also Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."). Given that the prosecution was under no obligation to *offer* a plea deal, Bruce's inability to *secure* one after "working on the plea" cannot have been an objectively unreasonable performance. *Cf. Groves v. United States*, 755 F.3d 588, 591-92 (7th Cir. 2014) (rejecting the petitioner's argument that his lawyer "was required to pursue [a] plea agreement" when the petitioner had already discussed the plea offer with his previous attorney and rejected it); *United States v. Hall*, 212 F.3d 1016, 1022 (7th Cir. 2000) ("[T]he successful negotiation of a plea agreement involves factors beyond the control of counsel, including … the cooperation of the prosecutor, who has no obligation to offer such an agreement.").

Even assuming (as Roy III suggests) that Bruce never even asked the Government for a plea deal, that still would not amount to constitutionally deficient performance. In *Frye* and *Padilla v. Kentucky*, 559 U.S. 356 (2010), there was no possible strategic reason for an attorney not to communicate a plea offer to his client or to fail to set forth the implications of pleading guilty. But there *is* potential strategy in declining to approach the prosecution asking for a plea deal—most obviously, it could be perceived as a sign that the defense's case is weak. Accordingly, Roy III has failed to establish that Bruce's performance fell below an objective standard of reasonableness. *See Brown v. Doe*, 2 F.3d 1236, 1246 (2d Cir. 1993) ("Adequacy of counsel can be evaluated on the basis of a lawyer's performance at [the plea bargaining] stage of the proceeding. However, it is not necessary that the defendant have counsel who recommends that a plea bargain be pursued."); *Vargas v. McEwen*, 2012 WL 6676091, at *7 (C.D. Cal. July 25, 2012) ("[T]he decision to initiate plea bargaining discussions with the prosecutor is the type of strategic decision within counsel's purview. Here, trial counsel was unquestionably aware of the option of initiating plea negotiations, but (according to Petitioner) opted against doing so. In other words, if, as Petitioner suggests, trial counsel decided never to broach the subject of a plea deal with the prosecutor, that decision was a strategic one that cannot be second-guessed on habeas review.") (citations omitted); *Barretto v. Giurbino*, 2008 WL 591045, at *6 (C.D. Cal. Feb. 13, 2008) ("If the State elects to extend a plea offer to a defendant, defense counsel must communicate the offer and must competently advise defendant regarding whether to accept. However, defense counsel who otherwise effectively represents a criminal defendant has no obligation to initiate plea negotiations.") (citations and footnote omitted).

Roy III intimates that there could have been an uncommunicated plea deal from the Government on the table at one time. Doc. 1 at 116-117 ("The petitioner wants to know if there

was ever a plea deal on the table ….").  Any such assertion is speculation and does not warrant

further investigation.  *See Gallo-Vasquez v. United States*, 402 F.3d 793, 797 (7th Cir. 2005)

("[A] hearing is not necessary if the petitioner makes conclusory or speculative allegations rather

than specific factual allegations.") (alteration in original) (internal quotation marks omitted).

### D.  Ineffective Assistance of Counsel at Sentencing

Roy III next alleges that Beal, his sentencing counsel, failed to "present tangible

evidence, witness testimony and medical records" at his sentencing hearing.  Doc. 1 at 121.  Roy

III maintains that "he absolutely [had] no role in the Spend and Redeem Program" and that if

Beal had sought to exclude the October 2007 stipulation admitting to his involvement in Spend

and Redeem, the loss amount enhancement under United States Sentencing Guidelines

("USSG") § 2B1.1(b)(1) would have been 18 rather than 20 levels.  *Id*. at 121-23.  Roy III also

contends that the court erred in applying (1) a three-level enhancement under USSG § 3B1.1(b)

for being a manager or supervisor when the criminal activity involved five or more participants

and (2) a six-level enhancement under USSG § 2B1.1(b)(2)(C) for causing substantial financial

hardship to 250 or more victims.  *Id*. at 122-23.  According to Roy III, those errors were caused

by Beal's general failure to gather "the new facts and testimony and … evidence."  *Id*. at 123.

Roy III's challenge to Beal's performance is without merit.  As discussed above, failing

to seek exclusion of the October 2007 stipulation was not *Strickland* error.  And Roy III cannot

establish that any of Beal's other alleged errors prejudiced him.  Roy III's advisory Guidelines

range was 188-235 months in prison.  *Fluker*, 08 CR 540, Doc. 389 at 54.  Yet the court

sentenced him to only 96 months out of concern that the enhancements "overstate[d] the

seriousness of the offense."  *Id*. at 47.  The court further stated that, even if it had agreed with

Roy III's position on the Guidelines range, it would have imposed the same sentence:

> And let me say that even if I agreed with the defendant's challenge regarding spend and redeem and housing, I would have imposed the same sentence, at least the same custodial sentence and the same supervised release, in light of the 3553(a) factors.
>
> I would submit two—I would subtract two points for the amount of the loss because we'd be between 2.5 million and 7 million, and I would subtract four for the number of victims, because right now, we're at six points, and it would go down to two points. So, his offense level would be 30, and the criminal history category would be I, and that would yield a range of 97 to 121 months. I still would have imposed the same 96-month custodial sentence, which would still be below—not much below, but would still be below the Guidelines range, and I still would have imposed the same three years of supervised release.

*Id*. at 63. Because he would have received the same sentence even if the Guidelines range had been lower, Roy III cannot establish that any of Beal's alleged errors prejudiced him.

### E. Conflict of Interest

Roy III next alleges that Bruce was ineffective because he had a conflict of interest. Doc. 46 at 1-4. As best as the court can tell, Roy III's argument is as follows. Prior to trial, Roy III paid upfront for O'Hern's travel expenses. *Id*. at 1. After O'Hern failed to qualify as an expert witness, he asked Bruce if he would still be paid. *Ibid*. Bruce directed him to check with Roy Jr.'s trial lawyer, Raymond Pijon, who told O'Hern that he would still be compensated for his time. *Id*. at 2. According to Roy III, this means that O'Hern had his travel expenses covered twice—once by him, and again by Roy Jr.'s attorney. Doc. 53 at 13. Roy III believes that Bruce intentionally had O'Hern paid twice "to pad his pockets with money from both Raymond Pijon and the petition[er] by using Mr. O'Hern as a pawn to get extra money." Doc. 46 at 2-3. This occurred because Roy III could not afford to pay Bruce—a fact that Roy III believes contributed to Bruce's poor work ethic. *Id*. at 3. Roy III says that the payment from Pijon to O'Hern caused Bruce to "show an unethical level of loyalty" to Roy Jr. *Ibid*. That is why, Roy III submits, Bruce failed to interview certain witnesses (because they would have shifted blame to his father)

and also why he never pursued a plea bargain (because any such plea deal would have required Roy III to testify against his father). *Id*. at 2-4.

Roy III's claim is meritless. "The Sixth Amendment right to effective assistance of counsel encompasses 'a correlative right to representation that is free from conflicts of interest.'" *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). Roy III's conflict claim is premised on *Daniels v. United States*, 54 F.3d 290 (7th Cir. 1995), which recognized that a conflict may "arise when a client's interests are adverse to his lawyer's pecuniary interests." *Id*. at 294. In *Daniels*, the § 2255 petitioner argued that his lawyer had coerced him into accepting a guilty plea because he could not afford to pay him. *Id*. at 293. The Seventh Circuit acknowledged that this could create a conflict of interest and remanded the case for a determination of whether the petitioner had been pressured to accept the plea. *Id*. at 295.

As the Seventh Circuit explained, "[t]wo frameworks exist for analyzing ineffective assistance of counsel claims based on a conflict of interest by defense counsel":

> One framework applies if defense counsel labored under an "actual" conflict of interest. *See Cuyler* [*v. Sullivan*, 446 U.S. 335 (1980)]. In such a case, [i]f there is any adverse effect on the attorney's performance, prejudice is presumed and the defendant's argument prevails. This standard, as set forth in *Cuyler*, applies if the defense counsel was faced with a choice between advancing his own interests above those of his client. A petitioner may show an adverse effect by demonstrating that there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest.
>
> Under the second analytical framework where there has been no "actual" conflict of interest alleged or shown, a petitioner must establish that the conflict resulted in ineffective assistance according to the familiar and more demanding *Strickland* standard, whereby the petitioner must demonstrate that counsel's representation fell below an objectively reasonable standard of care, and that there is a reasonable probability that but for counsel's unprofessional errors the trial outcome would have been different.

*Blake*, 723 F.3d at 880 (citations and internal quotation marks omitted). Roy III's allegations do not amount to a conflict of interest under either standard.

In *Daniels*, the attorney allegedly coerced his unpaying client to plead guilty so that he could cut his financial losses. By contrast, Roy III submits Bruce *forwent* negotiating a plea deal for him out of loyalty to a co-defendant's attorney—all because that attorney helped cover travel expenses for one witness. That story is implausible. Even assuming that Bruce pocketed the money that Pijon gave him to pay O'Hern, Bruce's pecuniary interests would have been far better served by having Roy III plead guilty instead of expending the time and resources preparing for and conducting Roy III's trial. (Recall that Bruce was retained, not appointed, and that Roy III was having trouble paying him.)

This case is distinguishable from *Lipson v. United States*, 233 F.3d 942 (7th Cir. 2000), which held that an actual conflict of interest arose where a co-defendant dictated the petitioner's legal defense because he was covering the petitioner's legal fees. *Id*. at 946. *Lipson* is inapposite here because Roy Jr. did not pay for Roy III's legal fees; in fact, Roy Jr. and Ronnanita both had appointed counsel, *Fluker*, 08 CR 540, Docs. 6, 14, and thus were in no financial position to pay Roy III's lawyer.

## II. *Giglio* and Confrontation Clause

Roy III contends that the Government violated *Giglio v. United States*, 405 U.S. 150 (1972), by allowing Norwood to testify despite his threatening voicemail. Doc. 46 at 5-6. *Giglio* holds that "any material evidence which might undermine the reliability of a government witness must be turned over to a defendant." *United States v. Jumah*, 599 F.3d 799, 808 (7th Cir. 2010). Roy III's theory is that the prosecution should not have allowed Norwood to testify given that the voicemail hurt Norwood's credibility. This theory fails for two reasons. First, *Giglio* simply

requires the Government to disclose impeachment evidence—it does not prevent the Government from using a witness whose credibility is subject to impeachment. Second, *Giglio* requires the Government to turn over impeachment evidence of which the defendant is unaware. Here, the opposite is true—Roy III knew about the impeachment evidence (as he received the message) and the Government did not. *Giglio* is not implicated under these circumstances.

Roy III further argues that Norwood's testimony violated his Sixth Amendment Confrontation Clause rights. Roy III argues that the Confrontation Clause requires that he "be given an opportunity for effective cross-examination" of the witnesses presented against him. *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). This is true, but Roy III and his attorney were free to explore Norwood's potential bias and motives on cross-examination and possessed all the information necessary to do so. Accordingly, the Confrontation Clause was not violated.

## III. Roy III's Motion to Substitute Counsel

Roy III claims that he "was denied his Sixth Amendment rights when the District Court denied the motion for withdrawal of counsel." Doc. 1 at 108. According to Roy III, he grew frustrated with Bruce's failure to respond to his phone calls and had to rely on his co-defendants' lawyers to learn of his court dates. *Id*. at 109. This "total break down in communication" led Roy III to stop paying Bruce's fees. *Ibid*. After conferring with Roy III, Bruce agreed to file a motion to withdraw. *Ibid*. Bruce instructed Roy III to draft a letter for submission to the court explaining why he wanted new counsel. Doc. 53 at 9. That letter, dated July 12, 2009, details Roy III's concerns over Bruce's representation. Doc. 1 at 113-14. But the letter was not attached to Bruce's single-page motion to withdraw. *Fluker*, 08 CR 540, Doc. 60. The motion

simply stated that "Roy Fluker, III has discharged the undersigned as his attorney and seeks court-appointed counsel." *Ibid*.

At the motion hearing before Judge Coar on July 16, 2009, the following exchange occurred:

> THE COURT: All right. We have a trial date of August 24. There are other defendants in the case. It is unrealistic to expect that a new attorney would be prepared to go to trial on August 24. So without more, I'm not going to grant this motion.
>
> MR. BRUCE: Can I just have a moment to consult with my client?
>
> THE COURT: Sure.
>
> (Brief pause.)
>
> MR. BRUCE: Your Honor, at this point I will be withdrawing motion.
>
> THE COURT: All right. The motion's withdrawn.

Doc. 47-3 at 2. Roy III claims he did not understand what happened at the hearing and asked Bruce to file the motion again, but Bruce told him he could not do so because it had already been denied. Doc. 1 at 110. There are three potential Sixth Amendment violations at issue: (1) that denying the motion deprived Roy III of the effective assistance of counsel; (2) that denying the motion deprived Roy III of the right to counsel of his choosing; and (3) that Bruce was ineffective in filing the motion to withdraw without Roy III's letter attached. Even putting aside waiver and forfeiture, Roy III has not established any violation.

## A. Denial of Effective Assistance of Counsel

A defendant's Sixth Amendment right to effective assistance of counsel may be violated if the court denies his motion to substitute counsel. "[A] court faced with a non-specific substitution motion must make a proper inquiry and a ruling" into the "request for new counsel." *United States v. Zillges*, 978 F.2d 369, 371-72 (7th Cir. 1992). As long as the defendant "has

been given an opportunity to explain to the court the reasons behind his request for substitute counsel, [the court] review[s] the denial of that request only for an abuse of discretion." *United States v. Harris*, 394 F.3d 543, 551 (7th Cir. 2005) (internal quotation mark omitted). But even if an abuse of discretion is found, the "denial of a motion for substitution of counsel will be upheld, despite an abuse of discretion, if the district court's error … does not result in a violation of a defendant's Sixth Amendment right to effective assistance of counsel." *Zillges*, 978 F.2d at 372. That is, the petitioner must show under *Strickland* that his attorney's performance was deficient and that he was prejudiced as a result. *See ibid.*; *see also United States v. Wallace*, 753 F.3d 671, 675 (7th Cir. 2014) ("[I]f a defendant is still afforded adequate representation, an erroneous denial of a motion for substitution is not prejudicial and is therefore harmless.") (internal quotation marks omitted); *Williams*, 616 F.3d at 689 (holding that, even when a district court fails to "inquire into a defendant's concerns with his current attorney[, an] abuse of discretion will only result in a new trial if [the defendant] can show prejudice. If not, then any error was harmless.").

Zillges and *Williams* are instructive. In *Zillges*, the Seventh Circuit explained that unless "the complaint underlying a request for substitution of counsel is sufficiently detailed, the court may not rule on the motion without conducting a proper hearing at which both attorney and client testify as to the nature of their conflict." 978 F.2d at 372 (internal quotation marks omitted). The court went on to hold:

> Although the district court did engage in an initial inquiry into Zillges's complaint, the court sought to elicit a general expression of satisfaction on the part of Zillges with his trial counsel rather than reasons for his dissatisfaction with counsel. In this instance the district court was obliged to make a more thorough investigation of the apparent conflict between the defendant and his attorney in order to protect the integrity of Zillges's Sixth Amendment right to counsel. Given the lack of detail in Zillges's complaint, the absence of a more thorough inquiry by the district court constitutes an abuse of discretion.

*Ibid.* (footnote omitted).  The Seventh Circuit similarly held in *Williams* that the district court

had abused its discretion when, after the defendant voiced concerns over his lawyer's adequacy,

the judge dismissively responded: "I really don't care what you think.  You got it?"  616 F.3d at

689.  But in both *Zillges* and *Williams*, the Seventh Circuit denied relief because the defendants

could not show that their lawyers had been constitutionally ineffective.  *See Williams*, 616 F.3d

at 690 ("Because Williams cannot satisfy his burden under either prong of the *Strickland*

standard, the district court's abuse of discretion was harmless.  Therefore, his drug conviction

will be affirmed."); *Zillges*, 978 F.2d at 373 (affirming the defendant's conviction because the

defendant could not meet his burden of showing *Strickland* prejudice).

Here, Judge Coar indicated that he would deny the motion to substitute counsel "without

more."  Given the bare-bones written motion, this is best read as an invitation to Roy III to

explain his concerns to the court.  Regardless, the court need not decide if Judge Coar abused his

discretion because Roy III has failed to show under *Strickland* that Bruce was constitutionally

ineffective or that he suffered prejudice.  As such, any potential error in denying the request to

substitute counsel is harmless and does not warrant a new trial.

### B.      Denial of Right to Counsel of Choice

"The Sixth Amendment right to counsel includes 'the right of a defendant who does not

require appointed counsel to choose who will represent him.'"  *United States v. Velazquez*, 772

F.3d 788, 797 (7th Cir. 2014) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144

(2006)).  "Consequently, a court cannot arbitrarily or unreasonably deny a defendant the right to

retain chosen counsel."  *United States v. Sellers*, 645 F.3d 830, 834 (7th Cir. 2011).  But that

right is not absolute, as the Supreme Court has "recognized a trial court's wide latitude in

balancing the right to counsel of choice against the needs of fairness and against the demands of

its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citation omitted). "In determining whether the decision was arbitrary, [the court] consider[s] both the circumstances of the ruling and the reasons given by the judge." *Sellers*, 645 F.3d at 834-35.

The right to counsel of choice "does not extend to defendants who require counsel to be appointed for them." *Wallace*, 753 F.3d at 675 (internal quotation mark omitted) (citing *Gonzalez-Lopez*, 548 U.S. at 151). There is no question that a defendant who has appointed counsel and seeks to obtain new appointed counsel does not have the right to counsel of choice. It is less clear whether the same holds where, as here, a defendant with retained counsel seeks appointed counsel; the courts have split on this question. *Compare United States v. Rivera-Corona*, 618 F.3d 976, 981 (9th Cir. 2010) (agreeing that "the denial of the defendant's request to replace his retained counsel with a court-appointed attorney implicated the qualified right to choice of counsel"), *and People v. Ortiz*, 800 P.2d 547, 553 (Cal. 1990) ("[w]e conclude that the reasons supporting the right of a nonindigent criminal defendant to discharge his retained counsel favor extension of that right to all criminal defendants" regardless of whether the defendant seeks appointed counsel), *with United States v. Mota-Santana*, 391 F.3d 42, 46-47 (1st Cir. 2004) (requiring a defendant who sought to replace retained counsel with appointed counsel to show good cause). In *Velazquez*, where the Government argued that the right to counsel of choice was inapplicable when a defendant sought to replace retained counsel with a public defender, the Seventh Circuit declined to "decide which analysis applies to this unusual set of facts because," even if the right to counsel of choice had been implicated, there was no error in denying the motion. 772 F.3d at 797.

So, too, here. Even if this right extends to Roy III, Judge Coar's denial of his motion was proper. Judge Coar expressed concern that, given the eleventh hour motion to substitute, it

would be unfair to the other two defendants to continue the trial so that Roy III's new counsel could get up to speed. The denial of Roy III's motion therefore was not arbitrary, but appropriately balanced Roy III's interests "against the needs of fairness to the litigants and against the demands of [the trial] calendar." *Sellers*, 645 F.3d at 834; *see also United States v. Sinclair*, 770 F.3d 1148, 1154-55 (7th Cir. 2014) (explaining how the district judge's concern for the last-minute nature of the request to substitute counsel and the costs "to specific third parties involved in the case" established that "the judge did not arbitrarily stick to the schedule for its own sake"); *United States v. Carrera*, 259 F.3d 818, 825 (7th Cir. 2001) (holding that the district court did not arbitrarily deny the defendant of counsel of choice when "the untimely nature of [his] motion coupled with its close proximity to trial … made it reasonable for the district court to question whether [the defendant's] motion was an attempt to delay the trial"); *compare Sellers*, 645 F.3d at 836 (holding that the district court should have granted a continuance to allow for the substitution of counsel where "the case was relatively simple and would not require a lengthy trial nor many witnesses") (distinguished by *Sinclair*, 770 F.3d at 1155, where "the [district] judge weighed the costs of a continuance to specific third parties involved in the case"). It is true that, on a defense motion made on the day trial was to commence, the trial was continued for several months, *Fluker*, 08 CR 540, Doc. 99, but Judge Coar could not have known at the time he denied Roy III's motion to substitute that that would happen.

### C. Ineffective Assistance of Counsel

Roy III argues that if Bruce had attached his letter to the motion to substitute counsel, "Judge Coar would have granted the motion." Doc. 53 at 9. Even if that were true, Roy III has failed to establish that, had he been granted new counsel, there is a reasonable probability that the outcome of his trial would have been different. As such, there is no *Strickland* error.

**IV.     Counsel's Failure to Turn Over the Case File**

Finally, Roy III contends that he has been stymied in presenting his petition because his counsel has not handed over his case file.  Given this, Roy III believes he is entitled to an evidentiary hearing or, alternatively, discovery under Rule 6 of the Rules Governing Section 2255 Proceedings.  "A § 2255 petitioner is entitled to an evidentiary hearing on his claim where he alleges facts that, if true, would entitle him to relief."  *Lafuente v. United States*, 617 F.3d 944, 946 (7th Cir. 2010).  "A hearing, though, is not required when 'the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  *Ibid.* (quoting 28 U.S.C. § 2255).  Rule 6(a) provides that a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure."

As detailed above, and after a thorough review of the trial court record, the court has concluded that all of Roy III's § 2255 claims fail either factually (because the evidence directly contradicts his allegations or does not show what he alleges it shows) or legally (because, even when his factual allegations are or could be assumed true, they do not amount to a constitutional violation).  Accordingly, Roy III has not established the good cause necessary to warrant additional discovery or an evidentiary hearing.

## Conclusion

For the foregoing reasons, Roy III's § 2255 motion is denied.  So, too, is his motion for attorney representation.  Doc. 69.  There is no constitutional right to appointed counsel in a § 2255 proceeding.  *See Oliver v. United States*, 961 F.2d 1339, 1343 (7th Cir. 1992) ("A section 2255 proceeding is an independent civil suit for which there is no constitutional right to appointment of counsel.").  For indigent petitioners, Rule 8(c) requires the court to appoint an attorney if an evidentiary hearing is held.  *See* Rule 8(c) of the Rules Governing Section 2255

Proceedings ("If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A."). If there is no evidentiary hearing, the petitioner has no statutory right to counsel, but the court still has discretion to appoint counsel under 18 U.S.C. § 3006A(a)(2)(B), which provides that "[w]henever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who … is seeking relief under section 2241, 2254, or 2255 of title 28." 18 U.S.C. § 3006A(a)(2)(B). Because, as noted above, all of Roy III's § 2255 claims fail either factually or legally, the interests of justice do now warrant the provision of an attorney.

Under Rule 11(a), "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See White v. United States*, 745 F.3d 834, 835 (7th Cir. 2014). Under this standard, Roy III must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (internal quotation marks omitted). Roy III has failed to make that showing, so a certificate of appealability is denied.

April 22, 2016

_____
United States District Judge